[Civ. No. 3848.   Second Appellate District, Division Two.—June 29, 1922.]

## THE CHARLES NELSON COMPANY (a Corporation), Respondent, v. PACIFIC WHARF & STORAGE COMPANY (a Corporation), et al., Appellants.

[1] NEGLIGENCE — CONFLICTING EVIDENCE — FINDINGS. — When the evidence of negligence as a fact is conflicting, or when the evidence consists of circumstances from which inferences may be drawn for or against the alleged negligence, it is the province of the trial court to determine whether the evidence establishes negligence as the direct and proximate cause of the loss.

[2] ID. — NEGLIGENT OPERATION OF STEAM CRANE — DESTRUCTION OF LUMBER BY FIRE—INFERENCE—FINDING.—In this action for damages for the destruction of plaintiff's lumber which had been stored on defendant's wharf, and which had been destroyed by a fire that started on a traveling crane operated by an employee of defendant, the trial court was justified in inferring that the oil in the fuel tank on defendant's crane carried a slight percentage of water, and that the engineer thoughtlessly turned the steam into the steam coil inside said tank and forgot to turn it off, thus causing a foaming and overflowing of the oil, which, running over and down the sides of the tank and being hot enough to throw off inflammable gases, took fire from the flame in the fire-box under the steam boiler and so caused the disastrous conflagration, and that inference was sufficient to warrant its finding that the fire was caused by the negligence of the defendant.

---

2. Liability for fire caused by stationary engine, furnace, or the like, note, Ann. Cas. 1917C, 771.

[3] ID.—ASSUMPTION OF LOSS—AGREEMENT OF PARTIES—EVIDENCE—
FINDING.—In this action for damages for the destruction by fire
of plaintiff's lumber while it was stored on defendant's wharf, the
trial court was justified in finding that plaintiff did not contract
to assume all loss of or damage to the lumber arising from fire
resulting from any cause whatsoever during the time the lumber
was piled on the wharf, but only such loss as might be directly
attributable to the striking longshoremen—defendant's employees;
and the destruction of plaintiff's lumber having been due to the
negligence of the defendant, and having taken place after such
strike was called off, that contract did not relieve defendant from
liability.

[4] ID.—LIABILITY FOR LOSS—SPECIAL CONTRACT—MEETING OF MINDS—
BURDEN OF PROOF.—The defendant having been responsible for
the loss of plaintiff's lumber arising from its own negligence or
that of its agents and employees unless it had been relieved of
that liability by reason of a special contract or understanding with
plaintiff, the burden was on it to prove such an understanding and
agreement; and if there was no meeting of minds, that is, if
plaintiff's representative did not understand the arrangement as
defendant's representative did, there was no agreement, and hence
no defense to defendant's negligence.

APPEAL from a judgment of the Superior Court of
Los Angeles County. Leslie R. Hewitt, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. N. Goodwin and Goodwin & Morgrage for Appellants.

Turner & Grainger and Hahn & Hahn for Respondent.

FINLAYSON, P. J.—Defendants appeal from a judgment in favor of the plaintiff in an action to recover damages for the destruction of certain lumber, the property of plaintiff, which had been stored on the wharf of the defendant Pacific Wharf & Storage Company, a corporation, and was destroyed by fire, caused, it is alleged, by the negligence of the Pacific Wharf & Storage Company, hereafter referred to simply as the "defendant" or as the "appellant." With the exception of the defendant E. A. Mills, the defendants and appellants other than the Pacific Wharf & Storage Company are the holders of stock in that corporation, and as such are sued upon their stockholder's statutory liability. Mills is not a stockholder, judgment

was rendered in his favor, and he is not a party aggrieved. As it is admitted that the defendant stockholders are properly chargeable with their respective proportions of plaintiff's claim for damages if the defendant corporation is liable, we shall treat the case as though the Pacific Wharf & Storage Company were the sole defendant and appellant.

Defendant, a wharfinger, owns a wharf at East San Pedro—Port Los Angeles. On August 11, 1916, certain lumber, the property of plaintiff, shipped from Oregon, was unloaded from the steamer "Daisy Gadsby" at East San Pedro and delivered to defendant at the latter's wharf. The lumber had been consigned by plaintiff to a consignee at Miami, Arizona, and was to be forwarded by rail to that consignee by defendant. Through its inability to get the necessary cars, defendant permitted the lumber to remain rough piled on its wharf until it was consumed by fire on August 18, 1916.

On the day of the fire defendant, through its employee, an experienced engineer, was operating a traveling crane which was used by it to handle the lumber and other material piled on its wharf. The crane and the engine which operated it rested upon and were fastened to an ordinary railroad flat car of standard gauge, thus permitting the crane to be run to any spot on defendant's wharf. The engine was operated by steam generated by petroleum which was conducted by gravity from a fuel tank through a one-inch pipe to an oil burner under the steam boiler. Between the fuel tank and the boiler, which was an upright or vertical boiler, was a space of about eight inches. The fuel tank was twenty-four inches wide, forty-two inches deep, and sixty-six inches long. Its bottom was thirty-six inches above the floor of the flat car. In the top of the fuel tank was a circular hole eighteen inches in diameter, through which the fuel oil was replenished when necessary. Inside the fuel tank, and connected with the boiler, was a steam coil by means of which the petroleum in the fuel tank could be heated when it was too thick to run readily to the burner. In this steam coil was a cut-off valve, which, when closed, prevented the steam from entering the coil. The only cover for the eighteen-inch hole in the top of the fuel tank was a loose, flat, circular piece of iron a little larger than the hole. The pipe to the steam coil

in the fuel tank passed through this iron covering in such a manner as to act as a hinge on which the cover could be turned from side to side without falling off, thus permitting access to the inside of the tank. Under the boiler of the engine was a fire-box forty-eight inches in diameter, lined with fire brick. Its door, oval-shaped, was twelve inches by nine inches. The burner in the fire-box, at the end of a half-inch pipe which entered the fire-box through a small hole in the door, was about two feet from the door.

The engineer in charge of the crane—and his is the only testimony upon the subject—testified that just before noon of August 18, 1916, he filled the fuel tank with petroleum from a storage tank on the premises; that he filled the fuel tank to within six or eight inches from its top; that he noticed nothing unusual about the oil; that after filling the fuel tank he ran the crane back upon the wharf and ate his lunch; that he operated the crane for about an hour after lunch without noticing anything unusual; that after operating it for about an hour he discovered a fire on the platform of the flat car, covering a space about a foot square immediately under the fuel tank; that he instantly shut off the steam and the oil that was entering the feed-pipe to the fire-box and jumped down on to the wharf; that he then looked up and saw the oil running over the fuel tank; that he saw it coming out of the hole in the top of the fuel tank and running down over the side of that tank to the platform of the crane. The engineer further testified that he could not recall having turned any steam that day into the steam coil in the fuel tank.

Plaintiff alleged and the court found that defendant negligently failed to provide and use upon the fuel oil tank suitable, proper, and necessary safety devices; that it negligently and carelessly operated the crane and fuel tank without such safety devices; that it operated the crane and used the fuel tank so negligently and carelessly that the fuel oil flooded out of the eighteen-inch manhole in the top of the tank and ran down the side thereof on to the floor of the crane near the fire-box, where it was ignited, and the flames ran therefrom upon the wharf, which thereby caught fire, and that the fire of the burning wharf, spreading to plaintiff's lumber, burned it, and that the

destruction of the lumber was the direct result of defendant's negligence.

About the 1st of June, 1916, the stevedores, that is, the men, other than the sailors, who were employed by and worked upon the vessels, unloading the lumber therefrom, but who had nothing to do with the lumber after it was unloaded and placed upon the wharf, went on a strike. There began, at the same time, a strike of the longshoremen, that is, the men who worked upon the dock or wharf as lumber handlers and attended to the handling and moving of the lumber after it was unloaded from the vessels and who only worked upon the wharf and not upon the vessels. The longshoremen who handled material for the defendant were its employees. This strike of the longshoremen was called off August 1, 1916, and the men voluntarily returned to work on August 3, 1916. The strike of the stevedores continued for a long time thereafter—until long after the burning of plaintiff's lumber. By reason of the situation created by the strike of these two classes of laborers, defendant, at the beginning of the strike in the early part of June, had a verbal agreement or understanding with each of its customers, including the plaintiff here, whereby it sought to limit its liability as a wharfinger. The exact nature of the verbal agreement between defendant and this plaintiff is sharply disputed, defendant claiming for it a much broader scope than is conceded by the plaintiff or found by the trial court.

As an affirmative defense, defendant set up in an amendment to its answer that the lumber in question was discharged from the vessel and piled on the wharf under an express agreement between it and plaintiff that it was to be so discharged and piled "at the sole risk of plaintiff from loss of said lumber or damage thereto arising from fire or theft resulting from *any cause whatsoever,* so long as said lumber or any part thereof remained on said wharf." The trial court found that plaintiff did not contract to assume all loss of or damage to the lumber arising from fire resulting from any cause whatever. More specifically, the findings are that defendant's business as a wharfinger was interfered with by the strike of the longshoremen; that about the 1st of June, and while plaintiff was discharging certain lumber from the steamer "Mukelteo,"

defendant informed plaintiff that it was having a strike, and that owing to its inability to move lumber on account of the longshoremen's strike it would expect plaintiff to assume any loss by fire or damage to material put on the wharf by plaintiff during *that* strike; that plaintiff understood from the conversation had between its agent and defendant's agent that defendant was seeking to have plaintiff "assume all such loss or damage *as might be caused by the strikers* and for only such material as plaintiff might put on said wharf during said *last mentioned strike* [the strike of the longshoremen]; and that the fire in question was not caused by any striker or strikers, but solely by the negligence of said defendant." The court further found that plaintiff never contracted or intended to contract to relieve defendant from its own negligence, but had in mind only the danger of loss or injury to lumber which might be caused by the strikers.

Appellant disputes its liability for the destruction of respondent's lumber, claiming that the evidence is insufficient to sustain either the finding that the fire was caused by its negligence or the finding that respondent did not contract to assume all loss of or damage to the lumber arising from fire resulting from any cause whatsoever during the time that the lumber was on the wharf.

If there is any evidence to warrant the finding of negligence we cannot review it on appeal. Direct and positive evidence of negligence as a fact is not required. Any circumstances which tend to prove it or from which it reasonably may be inferred will suffice. [1] When the evidence of negligence as a fact is conflicting, or when, as here, the evidence consists of circumstances from which inferences may be drawn for or against the alleged negligence, it is the province of the trial court to determine whether the evidence establishes negligence as the direct and proximate cause of the loss.

If these principles be applied to the record before us, it will clearly appear that we cannot disturb the trial court's finding of negligence. One witness, an inspector of oil for the city of Los Angeles and an expert upon the subject of petroleum oils, testified that in his opinion the fact that the petroleum ran out of the eighteen-inch manhole in the top of the fuel tank was directly attributable to one of

three causes. One of the three possible causes given by this expert is that the oil had water in it, and that, being "wet," it was subjected to heat, thus causing it to foam and overflow. The second of these three possible causes is that the oil, though "dry," was heated to such a degree that it expanded and overflowed the space between it and the top of the tank. The third reason assigned by the witness as a possible cause of the fire was that when the fuel tank was replenished from the storage tank oil was permitted to run down the sides of the fuel tank.

Of these three causes the first seems the most probable. The second seems improbable. The engineer, according to his testimony, filled the fuel tank to a level that brought it within not less than six inches from the top. If the oil was "dry," and not nearer the top than six inches, as the engineer testified, it is not probable that it would expand by the mere application of heat so as to fill the six-inch space between the level of the petroleum and the top of the fuel tank. The expert so testified, in effect. Nor is there probability in the third reason assigned by the expert as one of the possible causes of the fire. The engineer was positive that he had not filled the fuel tank; and if any oil had dripped on to that tank from the filling pipe which extended from the storage tank and been permitted to run down the side of the fuel tank, it probably would not have been ignited by the fire in the fire-box, for it would not have been hot enough to generate the necessary combustible gases. Moreover, if that had been the cause of the fire it probably would have manifested itself long before the expiration of the hour and more which ensued between the time when the engineer replenished the oil in the fuel tank from the storage tank and the time when the fire was discovered on the floor of the flat car. [2] On the other hand, if, as sometimes happens, the oil in the fuel tank was "wet" with a small percentage of water, and the steam from the boiler had been allowed to flow for a considerable length of time into the coil pipe in the fuel tank, the oil ultimately would foam and flow over the eighteen-inch hole in the top of the tank. The trial court, therefore, in spite of the fact that the engineer did not recollect having turned the steam into the coil pipe so as to heat the oil in the fuel tank to make it flow more

readily, was justified in inferring, as the most probable conclusion, that the oil in the fuel tank was not "dry," but "wet," that is, that it carried a slight percentage of water, and that the engineer, thoughtlessly, had turned the steam into the steam coil and had forgotten to turn it off, and that thus there happened just what the expert said would happen under such circumstances, namely, a foaming and an overflowing of the oil in the fuel tank, which, running over and down the sides of that tank and being hot enough to throw off inflammable gases, took fire from the flame in the fire-box and so caused the disastrous conflagration. It thus was a reasonable inference that the negligent manner in which the mechanism was operated by appellant's engineer occasioned the fire, and that, therefore, the destruction of respondent's lumber was caused by appellant's negligence in the manner alleged in the complaint. For these reasons our conclusion is that the evidence was sufficient to warrant the finding of negligence.

[3]  The evidence was likewise sufficient to justify the finding as to the character and scope of the agreement or understanding respecting respondent's assumption of the risk of loss by fire. It will be recalled that appellant's answer alleges that the understanding was that respondent was to assume the risk of loss by fire or theft *resulting from any cause whatsoever* so long as the lumber was on the wharf, but that the court found that the real understanding was that respondent was to assume the risk of loss by fire or theft *caused by the strikers* and only during the continuance of the longshoremen's strike.

If the record supported appellant's claim that the evidence justifies no other finding than one in accord with the allegations of its answer, a reversal of the judgment would be necessary under the doctrine enunciated in *Northwestern Mutual Fire Assn.* v. *Pacific Wharf & Storage Co.*, 187 Cal. 38 [200 Pac. 934.] In that case it was held that the general rule is that a depositary or bailee for hire in the course of his ordinary business cannot relieve himself by contract or notice from responding in damages for loss arising from his own negligence or that of his agents or servants; but in the case of a strike, with its attendant disorganization of discipline and system, the depositary, particularly if it be a corporation compelled to act only

through its employees, may refuse to accept goods except on condition of being released from liability for damages traceable to such disorganized conditions. There the trial court had found, in effect, that the wharf company received the lumber only upon the understanding that it would not be responsible for any loss or damage from any cause whatever until the strike was over. In the instant case the trial court has found that the understanding with respect to appellant's liability was much narrower than that which was found in the Northwestern Mutual Fire Association case. And if in the instant case the court's finding be supported by the evidence, the judgment must be affirmed. That the evidence does suffice to justify the finding is, we think, clearly shown by the record.

Whatever be the understanding which was arrived at by appellant and respondent, it was the result of a conversation between a Mr. Forgie, representing the respondent, and Mr. Mills, representing the appellant. Forgie testified, in part, as follows: "This whole conversation was with reference to lumber that we were going to discharge during the strike, and the sum and substance of Mr. Mills' conversation was that they [appellant] would not be responsible for loss by fire or damage on any material discharged from the dock during the period of the strike. . . . Q. Was anything said by Mr. Mills as to who he expected might cause a loss to any lumber piled on the wharf? A. He did. It was naturally what he thought, that it would be strikers he was afraid of. Q. Did he in words impress you with that view? A. In substance, yes; that was what he was afraid of, strikers—*of any damage that they might cause.* . . . The substance of what Mr. Mills said was that he was afraid of the strikers as regards fire or damage of material. . . . We were discussing the strike, and the thing he referred to was the movement of lumber owing to the strike. There was no question about lumber or anything that was going to happen other than just the trouble of the strike. Q. Referring to the agreement that was entered into between you and Mr. Mills respecting any lumber that was placed on this wharf by the plaintiff during the period of the strike, what strike was referred to? Do you refer to the men handling the lumber? A. They are called in this port lumber handlers.

In every other port I ever heard of they call them longshoremen. The strike ended early in August—about the first of August. . . . My understanding was that there were two strikes; there was the stevedores' strike and the lumber handlers' strike. . . . It is my understanding that anyone working on the wharves, the term is a longshoreman, and one working aboard a vessel, other than a sailor, is a stevedore. Q. Who employs the stevedores? A. The ship. Q. Who employs the longshoremen? A. The wharf company. . . . The Nelson Company had to assume the responsibility of all lumber that was put on the Pacific Wharf & Storage Company's dock owing to the Pacific Wharf & Storage Company being unable to move material, owing to the strike *of the men that were in their employ.* . . . Q. In other words, you understood from Mr. Mills that it was his intention, or the intention of Pacific Wharf & Storage Company, that the lumber that you rough piled or placed upon that wharf should from that time on be insured by the Nelson Company? A. No, I took it that we had to carry insurance so long as the strike lasted. Q. What I am getting at is what he said, not what you assume. A. I took that from the conversation I had with him. Q. You know the strike lasted there long after the cargo was discharged from the 'Daisy Gadsby,' don't you? A. No, I don't; *the strike was over; the strike of the wharfmen was over.* . . . Q. With regard to insurance, did you insure for the Charles Nelson Company the lumber unloaded from the Gadsby on defendant's wharf? A. No, sir. Q. Why not? A. Because on account of the strike of the lumber handlers was over, and the occasion for carrying insurance was past. . . . Q. That is your understanding of it? A. My understanding of it. Q. It wasn't anything Mr. Mills said to you not to insure? A. Other than my understanding *at the start of the strike.*"

[4] We think it clear from the foregoing that there was ample justification for the inference that the parties had in mind the danger of loss or injury caused by the strikers, and then only during the strike of appellant's employees— the longshoremen. There was no sharply defined, definite, and explicit verbal agreement between Mills and Forgie. It was from a rather desultory conversation that each received his impression of what the arrangement amounted to; and

since the burden was upon appellant to prove a mutually understood agreement, it follows that if there was no meeting of minds, that is, if Forgie did not understand the arrangement as Mills did, there was no agreement, and hence no defense to appellant's negligence. From Forgie's testimony the court was warranted in concluding that his understanding of the arrangement was that appellant was to be relieved from responsibility for such loss only as might be directly attributable to the striking longshoremen.

The judgment is affirmed.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 28, 1922.

All the Justices present concurred.

Richards, J., *pro tem.,* and Myers, J., *pro tem.,* were acting.